**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:24-cv-00226-MR**

| | | |
|---|---|---|
| **SANDY MARTIN SHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MITCHELL COUNTY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ———————————————— | ) | |

**THIS MATTER** is before the Court on the Motion for Summary Judgment filed by the Defendants Mitchell County, Donald Street, Rickey Wiseman, Stacey Hughes, and Terry Silvers [Doc. 39].

## I.   PROCEDURAL BACKGROUND

The Plaintiff Sandy Martin Shaw brings this suit against Mitchell County, Mitchell County Sheriff Donald Street in his individual and official capacities, and Mitchell County Sheriff's Office ("MCSO") employees Rickey Van Wiseman, Stacey Hughes, Terry L. Silvers, and Unknown John Doe Officers, in their official and individual capacities, as well as the Plaintiff's ex-wife Wanda Earp, and her daughters Erica Turner Crump and Sidney Marie Britt, arising from an alleged assault and the Plaintiff's subsequent involuntary commitment on September 2, 2021. [Doc. 1]. The Plaintiff brings

the following claims for relief: (1) a claim pursuant to 42 U.S.C. § 1983 for "unlawful seizure, detention, and involuntary commitment" against Defendants Wiseman, Hughes, and Silvers [Doc. 1 at ¶¶ 69-81]; (2) a § 1983 claim for Monell[1] liability against Mitchell County and Sheriff Street [id. at ¶¶ 82-93]; (3) an abuse of process claim under North Carolina law against Defendants Wiseman, Hughes, Silvers, Earp, Crump, and Britt [id. at ¶¶ 94-100]; and (4) a claim for false imprisonment under North Carolina law against Defendants Wiseman, Hughes, Silvers, Street, and Mitchell County [id. at ¶¶ 101-107].

The Plaintiff has obtained entries of default against Defendants Earp, Crump, and Britt. [See Docs. 17, 18, 24]. The John Doe Officers have never been identified or served.

The remaining Defendants now move for summary judgment. [Doc. 39].[2] The Plaintiff has filed a response in opposition [Doc. 42], and the Defendants have filed a reply [Doc. 46]. Having been fully briefed, this matter is ripe for adjudication.

---

[1] Monell v. Dep't of Soc. Svcs., 436 U.S. 658 (1978).

[2] The Defendants' memorandum in support of their motion for summary judgment did not comply with the Court's font requirements. [See Docs. 40, 44]. Accordingly, this memorandum was stricken, and the Defendants were allowed to file a corrected brief. [Doc. 45].

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"   Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)).   When ruling on a motion for summary judgment, the Court does not "weigh the evidence or make credibility determinations."   Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (quoting Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568-69 (4th Cir. 2015)).   "Regardless of whether he may ultimately be responsible for proof and persuasion, the party

3

seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party, who must convince the Court that a triable issue does exist. Id.

In considering the motion for summary judgment, the Court must view the pleadings and materials presented "in the light most favorable" to the nonmovant and must "draw all reasonable inferences" in the nonmovant's favor. Adams v. Trustees of Univ. of N.C.—Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.   FACTUAL BACKGROUND

Viewing the forecasts of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

The Plaintiff married Wanda Earp in 2012. [Doc. 40-3: Pltf. Dep. at 2]. In 2019, the Plaintiff and his wife moved to their home in Mitchell County, North Carolina, near the border with Yancey County (the "Shaw Residence"). [Id. at 3]. The couple made this move because Wanda's son, Rusty Britt, had purchased property nearby and wanted the Plaintiff and Wanda to help him start a "glamping" community called "Rusty's Roost." [Id. at 3-4].

On September 2, 2021, the Plaintiff told Wanda that their marriage was over and that he wanted a divorce. [Id. at 25]. The Plaintiff left the Shaw

Residence and drove to Asheville to look for an attorney. [Id. at 26]. While in Asheville, the Plaintiff ate a sandwich and had two vodka and cranberry drinks. [Id. at 28]. Wanda repeatedly called and texted him, begging him to come back home to talk about the marriage. [Id. at 26-27, 28].

As the Plaintiff was headed back to the Shaw Residence to talk to Wanda, Sidney called 911, stating that the Plaintiff was "manic. Very crazy … and he's telling her [Wanda] that it's over and he's gonna tear shit up and he's gonna burn this place down." [Id. at 33-34; Doc. 40-8: First 911 Call Tr. at 2]. The 911 operator informed the caller that law enforcement would be sent to the residence. [Doc. 40-8: First 911 Call Tr. at 4]. Defendant Hughes received the dispatch call and began making his way to the Shaw residence. [Doc. 40-5: Hughes Dep. at 3].

The Plaintiff arrived at his home in the early evening. [Doc. 40-3: Pltf. Dep. at 27]. In addition to carrying a Glock 26 on his person, the Plaintiff had an AR-15 lying on the front seat of his car. [Id. at 31, 32-33]. The Plaintiff also had three five-gallon cans filled with gasoline and diesel fuel in his car. [Id. at 38]. Upon the Plaintiff's arrival, Sidney asked the Plaintiff to go inside the home and talk, and the Plaintiff agreed. [Id. at 29]. Sidney and the Plaintiff began to argue, and the Plaintiff attempted to leave. When he walked outside onto the porch, he immediately encountered Erica aiming

5

Wanda's pistol at him and saying, "I'll kill you." [Id. at 29-30]. Fearing for his life, the Plaintiff attempted to disarm Erica by rushing her, yelling at her, sweeping her legs, and striking her hand holding the gun. During this altercation, the pistol discharged, striking the Plaintiff's left thumb. [Id. at 31]. Erica and the Plaintiff both collapsed on the porch floor, at which point Sidney grabbed the pistol and began beating the Plaintiff on the back of the head with the butt of the pistol. [Id.]. Eventually, Wanda said, "that's enough," and Sidney gave her the gun. [Id. at 32]. Although the Plaintiff was lawfully carrying a firearm pursuant to a concealed carry permit, he never brandished or displayed his firearm at any time during this altercation. [Id. at 31-32].

At some point after the Plaintiff arrived, Sidney called 911 a second time and provided a real-time narration of the events as they occurred to the 911 operator. [Doc. 40-9: Second 911 Call Tr.]. The shot that resulted in the injury to the Plaintiff's hand could be heard on the 911 call. [Id. at 2]. Sidney informed the 911 operator that the Plaintiff "went after my sister and the trigger got pulled and it hit," and that "he's like manic, he's got mental problems." [Doc. 40-12: Second 911 Call Tr. at 4, 6]. A male voice can be heard in the background saying, "you ain't seen nothing yet"; Sidney

attributed this statement to the Plaintiff.[3]  [Id. at 7].  Sidney stated, "Something's wrong with him, he's never acted like that. I knew he was capable of it but we've always been able to calm him down, but I knew this was it for my mama."  [Id. at 12].

The Plaintiff asked Wanda to take him to the hospital, and Sidney told the 911 operator that the Plaintiff was trying to make her mom get in his car. [Doc. 40-3: Pltf. Dep. at 33].  Fearing another attack, disoriented, and in severe pain due to the blood loss and injuries sustained to his thumb and head, the Plaintiff returned to his vehicle and began driving to the hospital. [Id. at 32-33, 37].

According to official county records, Mitchell County's Central Communications dispatched officers to the Shaw Residence at approximately 5:45 p.m.  [Doc. 43-8: CFS Report].  Separate from this dispatch, Sheriff Street sent a group text to all MCSO officers asking all of those who were available to respond to the reports of shots being fired at the Shaw Residence.  [Doc. 43-2: Silvers Dep. at 3, 4-5].

MCSO officers stopped the Plaintiff at approximately 6:06 p.m. on the road a short distance from the Shaw Residence. [Doc. 40-5: Hughes Dep. at

---

[3] There is nothing in the forecast of evidence to indicate that any other male was present at the Shaw Residence at the time of the altercation.

4-5]. The Plaintiff stopped his vehicle and got out with his hands up because "I'd just sat up there and listened to her [Sidney] lie to 911. I knew what was coming." [Doc. 40-3: Pltf. Dep. at 39-40, 41]. The officers directed the Plaintiff to "lay down," and he complied. [Id. at 40]. An unidentified officer approached and placed his knee in the center of the Plaintiff's back. [Id.]. The Plaintiff told this officer that he needed to have surgery on his arm, and he requested that the officer use two cuffs. [Id.]. The officer replied, "Fuck your surgery" and jerked the Plaintiff's arm twice, causing him pain. [Id.]. A Mitchell County lieutenant then told the officer to use two cuffs on the Plaintiff. [Id.]. While the Plaintiff was on the ground handcuffed, he moved his head to relax. At that point, Yancey County[4] Sheriff's deputy Jason Edmonds[5] slammed his gun into the back of Plaintiff's head and said, "You move again, I'll blow your fucking brains out." [Id. at 43-44]. The Plaintiff told the detaining officers that he was injured and the victim of a premediated attack. [Id. at 42]. At least one MCSO officer laughed at the Plaintiff in response. [Id.].

Defendant Hughes, who was on his way to the Shaw Residence, came upon the traffic stop of the Plaintiff. He observed the Plaintiff in handcuffs on

---

[4] Officers from both Mitchell County and Yancey County Sheriff's Departments were on the scene, as the Plaintiff's home is right on the Yancey and Mitchell county line. [See Doc. 40-5: Hughes Dep. at 7].

[5] Deputy Edmonds is not named as a defendant in this case.

the ground. He noted that the Plaintiff was "very loud, screaming, yelling at the officers." [Doc. 40-5: Hughes Dep. at 6]. The Plaintiff was also bleeding from his thumb, and it appeared to Defendant Hughes that the Plaintiff was having "serious emotional, mental something going on" and was a "danger to himself." [Id. at 6, 9, 15]. He observed that the Plaintiff also smelled "strongly of alcohol."[6] [Id. at 11]. Defendant Hughes further observed a rifle in the car along with some gasoline cans. [Id. at 10]. Hughes then went to the Shaw Residence to investigate the domestic disturbance, where he took pictures and interviewed Wanda, Erica, and Sidney. [Id. at 12, 13].

Defendant Wiseman was working at MCSO headquarters on the evening of September 2, 2021, when he received a call from communications regarding a domestic violence incident at the Shaw Residence. [Doc. 40-6: Wiseman Dep. at 2]. The information from dispatch was that the Plaintiff was in an altercation with his mother, not his wife and her daughters. [Id. at 9]. Before getting to the scene of the Plaintiff's arrest, Defendant Wiseman received a call from a Mitchell County deputy sheriff at the scene of the traffic stop asking him to obtain an involuntary commitment ("IVC") order for the Plaintiff. [Id. at 4-6]. Specifically, the deputy informed Defendant Wiseman

---

[6] The Plaintiff's blood alcohol concentration was .139 when it was tested approximately six hours later at Blue Ridge Regional Hospital. [Doc. 40-3: Pltf. Dep. at 50-51].

that the Plaintiff "was acting in a manic state [and] that he had been—a firearm was involved. He had been injured with the firearm. He had cans of gas and was threatening to burn his house down." [Id. at 7-8]. Defendant Wiseman did not check or inquire as to whether the Plaintiff had any history of mental illness or criminal record prior to seeking the IVC. [Id. at 8-9].

At 7:15 p.m., Defendant Wiseman appeared before a magistrate to secure a custody order involuntarily committing the Plaintiff for a psychiatric evaluation. [Doc. 43-10: IVC Petition and Order; Doc. 40-6: Wiseman Dep. at 10-11]. Defendant Wiseman presented under oath "the facts that [he] was given by radio from Communications and the deputy." [Doc. 40-6: Wiseman Dep. at 7, 11]. The magistrate's custody order relied solely on the information provided by Defendant Wiseman. [Doc. 43-10: IVC Petition and Order; Doc. 40-6: Wiseman Dep. at 11]. The IVC Petition stated as follows:

> A call came into Mitchell 911 that the respondent was in a manic state and was in an altercation with his mother. After an altercation with his family in which the subject had a gun and during a struggle, a round went through his hand. Subject told law enforcement officer that he had 3 cans of gasoline in which he was going to burn down his house. Due to the subject's current mental state, he [is] an immediate danger to himself and others.

[Doc. 43-10: IVC Petition]. The magistrate found reasonable grounds to believe the Plaintiff had a mental illness and was dangerous to himself or

others, and therefore entered an Involuntary Commitment Order ("IVC Order") ordering the Plaintiff to be taken into custody. [Doc. 40-11 at 4: IVC Order].

Defendant Wiseman took the IVC Order to Blue Ridge Regional Hospital, where the Plaintiff was being treated for his thumb. [Doc. 40-6: Wiseman Dep. at 11-12]. Defendant Wiseman gave the IVC Order to the officer on the scene, Defendant Silvers, who in turn advised the Plaintiff of its contents. [Doc. 40-6: Wiseman Dep. at 12; Doc. 40-7: Silvers Dep. at 3, 4, 6]. Despite the statements in the IVC Petition, Defendant Silvers observed that the Plaintiff appeared to be in pain but non-combative, not in a manic state, and not a threat to himself or others. [Doc. 43-2: Silvers Dep. at 10-11, 15-16].

After the Plaintiff was treated at Blue Ridge, Defendant Silvers transported the Plaintiff to Mission Hospital Copestone in Asheville to be evaluated. [Doc. 40-7: Silvers Dep. at 5, 7-8].

The first examination was done on September 3, 2021 by Dr. Emily Felty, who opined that the Plaintiff had a mental illness and was a danger to himself or others. [Doc. 40-12: First Examination Report]. Dr. Felty recommended that the Plaintiff be kept in an inpatient commitment for ten days. [Id. at 4; Doc. 40-3: Pltf. Dep. at 48]. The Plaintiff was examined a

second time on September 5, 2021. That examiner found that the Plaintiff "needs to be in a safe setting until we can clarify that he is not a danger to self or others." [Doc. 40-12: Second Examination Report at 5-7]. The examiner ordered the Plaintiff to be held inpatient for seven days. [Id. at 7]. The Plaintiff was released from Mission Hospital on September 9, 2021, after a doctor found that he did not pose a danger to himself or others. [Doc. 40-3: Pltf. Dep. at 49].

Upon his release, the Plaintiff was served with arrest warrants for resisting a public officer from the vehicle stop and for assault charges brought by Erica and Sidney. [Id. at 18, 19-20, 21]. The Plaintiff pled guilty to the resisting charge. [Doc. 40-13 at 4: Judgment]. The District Attorney's Office determined that nobody would be prosecuted for the altercation at the Shaw Residence. [Doc. 40-5: Hughes Dep. at 16, 17].

IV. **DISCUSSION**

A. **Section 1983 Claims**

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. To prevail on a § 1983 claim, the plaintiff has the burden of establishing (1) the deprivation "of a right secured by the Constitution or laws of the United

States," and (2) that "the alleged deprivation was committed under color of state law." Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999). By its terms, § 1983 "creates no substantive rights; it merely provides remedies for deprivation of rights established elsewhere." City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985) (citation omitted).

In his Complaint, the Plaintiff asserts a singular claim under § 1983 Defendants Wiseman, Hughes, and Silvers in their individual capacities for "unlawful seizure, detention, and involuntary commitment." [Doc. 1 at 15-16]. A closer reading of this claim, however, reveals that the Plaintiff appears to be asserting claims for excessive force and for unlawful seizure and detention (i.e., arrest without probable cause and involuntary commitment without due process). [Id. at ¶ 76]. The Court will address each of these claims in turn.

### 1. Excessive Force

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…." U.S. CONST. amend. IV; Mapp v. Ohio, 367 U.S. 643, 655 (1961). "The Fourth Amendment bars police officers from using excessive

force to effectuate a seizure." <u>Yates v. Terry</u>, 817 F.3d 877, 884 (4th Cir. 2016).

Here, the Plaintiff claims that an officer used grossly excessive force by slamming the back of a pistol into the Plaintiff's head while he was handcuffed.[7] [Doc. 1 at ¶ 73].

In order for a defendant to be held liable under § 1983, a plaintiff must "affirmatively show[ ] that the official acted personally in the deprivation of the plaintiff's rights." <u>Wright v. Collins</u>, 766 F.2d 841, 850 (4th Cir. 1985) (quoting <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1977)). The Plaintiff has failed to present a forecast of evidence that any of the individual Defendants were involved in slamming the back of a pistol into his head. On the contrary, the Plaintiff testified that this action was done by a Yancey County Sheriff's deputy who has not been named in this action. Accordingly, the Plaintiff's excessive force claim against the individuals Defendants must necessarily fail.

---

[7] This incident is the only act of excessive force identified in the Plaintiff's § 1983 claim itself. Elsewhere in the Complaint, the Plaintiff alleges other acts of excessive force, including the jerking of his right arm while handcuffing him and the refusal of "immediate medical treatment." [Doc. 1 at ¶¶ 48.a, b]. As for the jerking of his arm, the Plaintiff has not presented any forecast of evidence attributing that action to any of the named Defendants. As for the delay in medical treatment, the Plaintiff has failed to present a forecast of evidence that there was an unreasonable delay in providing medical assistance to the Plaintiff at the traffic stop. <u>See</u> <u>Martin v. Gentile</u>, 849 F.2d 863, 871 (4th Cir. 1988) (holding that pretrial detainee can show a due process violation where medical treatment is unreasonably delayed where the need for such treatment is apparent).

### 2.    Unlawful Seizure and Detention

In North Carolina, a person who has knowledge of an individual who has a mental illness and is either "dangerous to himself" or "dangerous to others," may appear before a clerk or magistrate and execute an affidavit to this effect, and petition the clerk or magistrate for issuance of an order to take the respondent into custody for examination by a commitment examiner. N.C. Gen. Stat. § 122C-261(a). "Dangerous to self" means an individual who "would be unable, without care….to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations." N.C. Gen. Stat. § 122C-3(11)(a). "Dangerous to others" is defined as someone who "has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another…" N.C. Gen. Stat. § 122C-3(11)b.

The involuntary commitment of an individual for an emergency mental health evaluation constitutes a seizure within the Fourth Amendment. <u>See Glass v. Mayas</u>, 984 F.2d 55, 58 (2d Cir. 1993). "Determining whether a person's Fourth Amendment rights have been violated in the mental health context requires [the court] to determine whether the officials had probable cause to seize the person for an emergency mental evaluation." <u>Barrett v.</u>

Pae Gov't Servs., Inc., 975 F.3d 416, 429 (4th Cir. 2020). "Such probable cause exists when the facts and circumstances within the defendant's knowledge and of which the defendant had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." Id. (quoting in part Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 172 (4th Cir. 2016) (internal quotation marks omitted)).

Probable cause is determined by a "totality-of-the-circumstances" approach. Illinois v. Gates, 462 U.S. 213, 230 (1983). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotation marks omitted). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." Id. "This is particularly true in the mental health context where police officers and mental health professionals are called upon to make a number of difficult judgment calls in their efforts to protect both the individual and the public from potential dangers, and there is a distinct lack of clarity in the law governing seizures for psychological evaluations." Barrett, 975 F.3d at 429 (citations and internal quotation marks omitted).

Here, the Plaintiff was involuntarily committed pursuant to an IVC Order, which was issued by a magistrate upon a determination that there was probable cause to believe that the Plaintiff had a mental illness and presented a danger to himself or to others. [Doc. 40-11 at 4: IVC Order]. The issuance of a warrant or indictment usually "conclusively determines the existence of probable cause," unless it can be shown that an officer "deliberately supplied misleading information that influenced the [judge's or grand jury's] decision." Durham v. Horner, 690 F.3d 183, 189 (4th Cir. 2012). In addition to being misleading, such information must also be material to the determination of probable cause. To determine whether an alleged misrepresentation was material, the Court must excise the misrepresentation and consider whether the "corrected" warrant would establish probable cause. See id.; see also Miller v. Prince George's County, 475 F.3d 621, 628 (4th Cir. 2007).

The Plaintiff argues that Defendant Wiseman's petition was untrue and misleading because (1) the Plaintiff had not in fact been in an altercation with his mother, but with his wife and step-daughters; (2) the Plaintiff did not brandish a firearm during the altercation, but the petition implies that the Plaintiff did so and was shot with his own gun; (3) the Plaintiff did not tell law enforcement that he was going to burn down his house; and (4) the Plaintiff was not, in fact, an immediate danger to himself or others. With regard to

the first three statements, to the extent that any of these statements were misleading, they were not material to the determination of probable cause. If these allegedly inaccurate statements were excised (or corrected) and the information about whose bullet the gun came from was clarified, Defendant Wiseman's petition would read as follows:

> A call came into Mitchell 911 that the respondent was in a manic state and was in an altercation with his **[wife and her adult daughters]**. After an altercation with his family in which the subject had a gun and during a struggle, a round went through his hand. **[The round came from his stepdaughter's gun.]** Subject told **[his wife and her daughters]** that he had 3 cans of gasoline in which he was going to burn down his house. Due to the subject's current mental state, he [is] an immediate danger to himself and others.

[Doc. 40-11 at 2: IVC Petition] (bold and bracketed material added). Even with the allegedly inaccurate statements excised, probable cause still would exist for the Plaintiff's detention because there would be enough probable cause for a magistrate to believe that the Plaintiff presented a danger to himself or others.

As for the statement that the Plaintiff was "an immediate danger to himself and others," this statement was a conclusion that the officers at the traffic stop reached based on their observations of the Plaintiff. The undisputed forecast of evidence shows that Defendant Hughes received a

call from dispatch advising that the Plaintiff was in a manic state and that he was threatening to burn down his house. While Hughes was en route to the Shaw Residence, an additional message was sent out by dispatch reporting that shots had been fired and that the Plaintiff had been shot. When the Plaintiff was stopped by officers a short distance from the residence, he was clearly injured, smelled strongly of alcohol, was in an agitated and emotional state, was yelling and screaming at the officers. Critically, the officers also observed that he had firearms and multiple cans of gasoline in his vehicle.

The Plaintiff argues that there is no forecast of evidence that he made any statement—to the officers or to his family—indicating that he was a threat to himself or anyone else. [Doc. 42 at 7]. Even assuming that is true, however, the undisputed fact remains that the officers had been *informed* that he had made such statements. The report of such statements, combined with the officers' observation of the Plaintiff's agitated behavior, his intoxicated state, the reports of a physical alteration and a shooting at his residence, and the presence of firearms and gasoline in his vehicle, reasonably led the officers to believe that the Plaintiff was suffering from a mental illness and a danger to himself or to others such that an involuntary

commitment was warranted.[8]  As such, no reasonable jury could conclude that the inclusion in the IVC Petition of the statement that the Plaintiff was "an immediate danger to himself and others" was a materially false statement.

The Plaintiff contends that he was "handcuffed and compliant at all relevant times" during the traffic stop, and thus, the officers had no basis to believe that he was an imminent danger to himself or anyone else.  [Doc. 42 at 7].  The Plaintiff, however, offers no forecast of evidence in this regard, and he does not dispute Defendant Hughes' characterization of his behavior at the traffic stop.  Moreover, the Plaintiff's argument that he was "compliant at all relevant times" is precluded by his subsequent plea of guilty to the charge of resisting a public officer, a charge which stemmed from his conduct during this traffic stop.  See Heck v. Humphrey, 512 U.S. 477, 485-87 (1994).

---

[8] The fact that the Plaintiff was observed to be calm and cooperative a few hours later in the hospital does not undermine this probable cause determination.  A person suffering from a mental illness may not exhibit symptoms of such illness at all times.  Moreover, the fact that doctors determined several days later that the Plaintiff was not in fact suffering from a mental illness does not negate the officers' prior determination that there was probable cause to believe that the Plaintiff was exhibiting signs of a mental illness.  "Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring, a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition."  Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997) (citations omitted).

For all of these reasons, the Court concludes that the Defendants had probable cause to believe that the Plaintiff presented a danger to himself and others. The Plaintiff's unlawful detention claim arising from his involuntary commitment, therefore, must be dismissed.[9]

### 3. Qualified Immunity

The Defendants contend that even if they lacked probable cause to seize and detain the Plaintiff for an involuntary commitment, they are entitled to the protection of qualified immunity. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (citation and internal quotation marks omitted).

---

[9] The Plaintiff also argues that Sheriff Street is personally liable for his role in the Plaintiff's unlawful detention. [Doc. 42 at 13-16]. The Plaintiff did not present such a claim against Sheriff Street in his Complaint. "[A] plaintiff may not raise new claims after discovery has begun without amending his complaint." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009). Even if the Plaintiff had properly asserted such a claim, it would be dismissed for the reasons asserted supra.

Here, the Defendants are entitled to qualified immunity because the Plaintiff's right to be free of being detained for involuntary commitment under these facts was not clearly established. The Fourth Circuit has recognized that there is a "lack of clarity in the law governing seizures for psychological evaluations, compared with the painstaking definition of probable cause in the criminal arrest context." Raub v. Campbell, 785 F.3d 876, 882 (4th Cir. 2015) (citations and internal quotation marks omitted). Unlike the determination of probable cause in a criminal case, probable cause in the mental health context requires an assessment of a "dual concern" not present in criminal cases. See Cloaninger ex. rel. Estate of Cloaninger v. McDevitt, 555 F.3d. 324, 334 (4th Cir. 2009) ("the reasonableness of the officers' response must be gauged against the reasonableness of their perceptions—in that case, of a genuine danger not only to the residents of the apartment complex but to the plaintiff herself") (internal citations and quotation marks omitted). Under the facts presented to them in this case, the Court concludes that the Defendants' conduct was objectively reasonable and that they are therefore entitled to qualified immunity.

### 4. Monell Liability

As the Plaintiff has failed to present a forecast of evidence to support any underlying constitutional violation, his municipal liability claims against

Sheriff Street, Mitchell County, and Defendants Hughes, Silvers, and Wiseman in their official capacities must also fail. <u>See</u> <u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee."); <u>Belcher v. Oliver</u>, 898 F.2d 32, 36 (4th Cir. 1990) ("Because it is clear that there was no constitutional violation we need not reach the question of whether a municipal policy was responsible for the officers' actions.").

## B. State Law Claims

### 1. Abuse of Process

The tort of abuse of process "is the misuse of legal process for an ulterior purpose. It consists in the malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ. It is the malicious perversion of a legally issued process whereby a result not lawfully or properly obtainable under it is attempted to be secured." <u>Fowle v. Fowle</u>, 263 N.C. 724, 728, 140 S.E.2d 398, 401 (1965) (citation omitted) (emphasis in original). To prove an abuse of process claim under North Carolina law, a plaintiff must demonstrate "(1) a prior proceeding was initiated against the plaintiff by the defendant or used

by him to achieve an ulterior motive or purpose; and (2) once the proceeding was initiated, the defendant committed some willful act not proper in the regular prosecution of the proceeding." <u>Semones v. S. Bell Tel. & Tel. Co.</u>, 106 N.C. App. 334, 341, 416 S.E.2d 909, 913 (1992).

Here, the Plaintiff has alleged that Defendant Wanda Earp conspired with her two daughters, Erica Crump and Sidney Britt, to lure the Plaintiff back to the Shaw Residence "to provoke an altercation resulting in [the Plaintiff's] death or, failing that, his false arrest and/or involuntary commitment in an attempt to prevent [the Plaintiff] from divorcing Wanda Earp and recovering marital and personal assets, including [the Plaintiff's] personal investments in Rusty's Roost…." [Doc. 1 at ¶ 31]. The Plaintiff further has alleged that as part of this conspiracy, Wanda, Erica, and Sidney "enlisted the assistance of . . . officers in the MCSO to coordinate a law enforcement response to the altercation that Wanda Earp, Erica Crump, and Sidney Britt intended to create." [<u>Id.</u> at ¶ 32]. Critically, however, the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that any such conspiracy existed.[10]

---

[10] The Plaintiff testified at his deposition that after his altercation with Erica, he "knew [he was] being set up" and "that this whole thing was a plot to kill me." [Doc. 40-3: Pltf. Dep. at 36]. Other than the Plaintiff's own conclusory speculation, however, the Plaintiff offers no forecast of evidence that his wife and step-daughters were plotting to kill him or have him involuntarily committed, much less that the Mitchell County Sheriff's Office was willingly involved with such a conspiracy.

The Plaintiff's theory—that the Defendant officers conspired with his ex-wife and stepdaughters to involuntarily commit the Plaintiff when his ex-wife's attempt to murder him was unsuccessful—is utterly unsupported by the record and borders on frivolous. The Plaintiff's abuse of process claim against the Defendant officers, therefore, is dismissed.

### 2. False Imprisonment

A claim of false imprisonment requires a showing of "the illegal restraint of a person against his will." Emory v. Pendergraph, 154 N.C. App. 181, 185, 571 S.E.2d 845, 848 (2002) (citation omitted). Thus, a claim of false imprisonment necessarily "calls for the absence of probable cause." Massey v. Ojaniit, 759 F.3d 343, 358 (4th Cir. 2014). Because the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that probable cause was lacking for his involuntary commitment, the Plaintiff's state law claims for false imprisonment against Defendants Wiseman, Hughes, Silvers, Street, and Mitchell County also must be dismissed.

### C. Doe Defendants

In the caption of his Complaint, the Plaintiff also names as defendants "Unknown John Doe Officers" in their official and individual capacities. [Doc. 1 at 1]. While the Plaintiff alleges that these Doe Defendants are employees

of the MCSO, the Plaintiff does not assert any specific claims against them. [See Doc. 1 at ¶ 7 (alleging that "it will require further discovery to identify these individuals, their specific acts, and their specific omissions")]. Because the Plaintiff has not asserted any claims against the Doe Defendants, the Court will dismiss these defendants without prejudice *sua sponte*.

## V.     CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment is granted, and the Plaintiff's claims against the Defendants Mitchell County, Mitchell County Sheriff Donald Street, and Mitchell County Sheriff's Office ("MCSO") employees Rickey Wiseman, Stacey Hughes, and Terry Silvers, in their official and individual capacities are dismissed with prejudice. Further, the Defendants identified in the Plaintiff's Complaint as "Unknown John Doe Officers" are dismissed without prejudice. Finally, the Plaintiff will be directed to take further action against Defendants Earp, Crump, and Britt, so that this action may be drawn to a close.

## **O R D E R**

**IT IS, THEREFORE, ORDERED** that:

(1)     The Defendants' Motion for Summary Judgment [Doc. 39] is hereby **GRANTED**, and the Plaintiff's claims against the

Defendants Mitchell County, Mitchell County Sheriff Donald Street, and Mitchell County Sheriff's Office ("MCSO") employees Rickey Van Wiseman, Stacey Hughes, and Terry L. Silvers, in their official and individual capacities, are **DISMISSED WITH PREJUDICE**.

(2) The Defendants identified in the Complaint as "Unknown John Doe Officers" are hereby **DISMISSED WITHOUT PREJUDICE**.

(3) Within fourteen (14) days of the entry of this Order, the Plaintiff shall file an appropriate motion or otherwise take further action with respect to the Defendants Wanda Earp, Erica Turner Crump, and Sidney Marie Britt. **The Plaintiff is advised that failure to take further action against these Defendants will result in the dismissal of the Plaintiff's claims against them without prejudice.**

**IT IS SO ORDERED.**

Signed: March 9, 2026

Martin Reidinger
Chief United States District Judge